2002 UT App 9

**STATE of Utah, Plaintiff and Appellee,**

v.

**Raymond John CHAVEZ, Defendant and Appellant.**

**No. 20000687–CA.**

Court of Appeals of Utah.

Jan. 17, 2002.

Kent R. Hart and David C. Biggs, Salt Lake City, for Appellant.

Mark L. Shurtleff and Jeanne B. Inouye, Salt Lake City, for Appellee.

Before BILLINGS, Associate P.J., and GREENWOOD, and ORME, JJ.

## OPINION

ORME, Judge.

¶ 1 Defendant Raymond John Chavez was charged with rape of a child, a first degree felony in violation of Utah Code Ann. § 76–5–402.1 (1999). A jury found him guilty of the lesser included offense of attempted rape of a child, also a first degree felony, in violation of Utah Code Ann. §§ 76–5–402.1, 76–4–101 (1999). Defendant appeals. We reverse and remand for a new trial.

## BACKGROUND

■ ¶ 2 "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Kruger*, 2000 UT 60,¶ 2, 6 P.3d 1116 (citation omitted).

¶ 3 During the late evening of December 12, 1999, thirteen-year-old Amy was at home watching her four-year-old brother while their mother was out with her boyfriend. At about 10:30 p.m., Chavez, a family friend and former neighbor, stopped at Amy's home and asked to use the telephone to call for a ride. Amy said that would be fine. Amy told Chavez that she was going to bed, but she said it was alright for Chavez to stay in the home while waiting for his ride.

¶ 4 Amy went into her room and fell asleep on her bed. Amy awoke when she heard the window blinds in her room moving and discovered Chavez in her room. Chavez said he was watching out Amy's window for his ride to arrive because the porch light cast a glare on the front room window. Amy asked Chavez to leave her room, which he did. Amy then went back to sleep.

¶ 5 Sometime later, Amy awoke a second time to find that Chavez had lifted her shirt and was kissing her back. Amy yelled at Chavez to stop, and he again left the room.[1] After lying on her bed "for a second," Amy got up to see if her mother had returned.

¶ 6 Amy's mother had come home and was downstairs watching television with her boyfriend, while Chavez remained upstairs in the living room. Amy called downstairs to her mother, intending to tell her what Chavez had just done. When her mother came within view at the bottom of the stairs, however, Amy thought, "Well, you know, it's not really a big deal, so just leave it at that." Amy instead asked her mother to go to the store to buy her some tampons.

¶ 7 Amy returned to her bedroom, closed the door, placed a small object against the door, and went back to sleep. She awoke again, only to find Chavez on his knees between her legs. Her pants and underwear were hanging from her right leg, and Chavez had his pants down and was propping one of

---

1. Deputy Mortensen testified at trial, based on his recollection of his interview with Amy, that Amy "screamed at [Chavez], yelled at him, told him to leave, and he did." Amy's trial testimony, however, was that upon waking to find Chavez kissing her back she "turned around and ... asked him what he was doing," and stated, "You need to leave my room," to which he replied, "All right; all right," and left.

her legs up with his arm. Amy started yelling for her mother and tried to get Chavez off her. Chavez told her, "Your Mom is gone," and said, "Come on, you know you want to do it." Amy finally got out from under Chavez and ran into the bathroom where she remained until she heard voices, including her mother's, in the kitchen. Crying, Amy then left the bathroom and encountered her mother. Amy's mother told Amy that she had forgotten to pick up tampons for Amy, and then asked her why she was crying. Amy replied, "I'm not," and went to her room. Amy went back to sleep only when Chavez had left the home.

¶ 8 The next morning at school, Amy did not feel well and went to the sick room, accompanied by her friend Debbie. While in the sick room, Amy told Debbie that a family friend had sexually assaulted her the night before. Debbie advised Amy to tell her mother about the incident. Amy said she could not tell her mother, and so Debbie contacted the school counselor. The counselor called the police. Shortly thereafter, Deputy Mortensen arrived at the school to interview Amy. While the school counselor first spoke to Deputy Mortensen, Amy "sneaked into the phone room," called her mother, and, after inquiring about who was then at the home, told her mother that "something happened last night while you were gone.... [I]t involved Ray [Chavez]." Her mother replied, "I'll call you back."

¶ 9 Amy then gave a statement to Deputy Mortensen. Amy gave another statement about a month later to Detective Rackley. Amy also testified at both the preliminary hearing and at Chavez's trial. Each time Amy recounted the incident, she added or forgot details and contradicted portions of her earlier versions of what happened.

¶ 10 A number of discrepancies in Amy's accounts of the incident came out at trial. Amy told Deputy Mortensen that it was because she was experiencing severe cramping and discomfort on the night of the incident that she took four Tylenol PM tablets and asked her mother to get her some tampons. Later, after the testing of Amy's underwear showed no signs of blood, Amy testified at trial that she had only been "stomach sick," had taken only two Tylenol PM tablets, and that she was not menstruating and did not

need tampons. She testified that when she decided not to tell her mother about Chavez's kissing her on the back that she just told her mother the first thing that came to her mind, which happened to be a request for tampons.

¶ 11 Amy conveyed to Deputy Mortensen that Chavez's genitals were "fully visible," and at the preliminary hearing she testified that the first thing she saw when she awoke the third time was Chavez masturbating. To Detective Rackley and at trial, however, Amy said that although she knew Chavez's pants were down because she could see the sides of his legs, she did not see his penis and did not know if he had underwear on because he was too close to her. Furthermore, at trial Amy claimed no recollection of ever having said she saw Chavez masturbating.

¶ 12 Finally, Amy never mentioned a rape, i.e., a touching of Chavez's penis to her vagina, see Utah Code Ann. §§ 76–5–402.1, 76–5–407(2)(b)(v) (1999), to Deputy Mortensen. She did not claim that Chavez had touched, penetrated, or attempted to penetrate her vagina, until speaking with Detective Rackley a month later. Amy never gave a reason—in fact, she had "no idea"—why she failed to mention such a touching earlier. At trial, Amy testified that Chavez's penis did touch her vagina, but she admitted that she could not tell if there was clothing over his penis when he did so, but, she said, "it felt like there wasn't."

¶ 13 Other evidence supporting Chavez's conviction came primarily from Joseph Young. Young had been in jail with Chavez. Young testified that while in jail Chavez had confessed to Young that he had raped Amy. Young's recounting of Chavez's alleged story, while varying in some particulars, substantially corroborated Amy's account on material points.

¶ 14 On cross-examination, defense counsel elicited from Young that he had been either arrested for or convicted of numerous felonies involving dishonesty. Young also admitted that he had testified as a police informant on at least twenty occasions in the past. He claimed, however, that he had never received anything in exchange for his testimony, such as dismissed charges or sentencing recommendations. He said that he came forward

in this case because he wanted to be a good citizen and because his own daughter had been raped. He also said that, although at the time of his testimony he was awaiting sentencing on another crime, he wanted "absolutely nothing" in exchange for his having testified. The State bolstered Young's credibility by eliciting from him that in testifying over twenty times for the State, he had never been prosecuted for perjury and also that by coming forward in this case, he had been labeled a snitch and become an outcast while in jail.

¶ 15 On the first day of trial, defense counsel learned not only that Young was incarcerated while awaiting sentencing, but also that he was acting as an informant for the federal Drug Enforcement Administration (DEA). The prosecutor assured the trial court that Young was not receiving any benefits for testifying in this case, and the trial court accepted that representation.[2] The trial court prohibited defense counsel from questioning Young both about his work for the DEA and about his current incarceration. Defense counsel objected to the court allowing Young to testify without being subject to cross-examination on these points. The prosecutor explained that to allow Young to testify regarding his custody status "may ... compromise the information in the possession of the State," and to allow him to testify regarding his work for the DEA would "compromise people's safety." The prosecutor did not, however, explain what type of information or whose safety would be compromised, in what way, or how. The court concluded that given the "sensitive nature of the serious charges which are currently under investigation ... keep[ing] that information from both the defendant[3] and the jury,

while to some extent infringing upon the opportunity to cross-examine [Young] ... outweigh[s] the cross-examination infringement."

¶ 16 The jury returned a verdict of guilty to the lesser included offense of attempted rape of a child. Defendant now appeals.

## ISSUE AND STANDARD OF REVIEW

■■ ¶ 17 Defendant argues that he was denied his Confrontation Clause right[4] to confront the witnesses against him when the trial court barred defense counsel from asking Young about his relationship with the DEA and about his custody status at the time of trial. When reviewing a trial court's decision to limit cross-examination, we review the legal rule applied for correctness and the application of the rule to the facts of the case for an abuse of discretion. *See State v. Stewart*, 925 P.2d 598, 599–600 (Utah Ct.App. 1996). If an error does occur, we must determine "whether, assuming that the damaging potential of cross-examination [had been] fully realized," the error was nonetheless "harmless beyond a reasonable doubt." *See Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

## CONFRONTATION CLAUSE VIOLATION

■■ ¶ 18 "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness[.]" *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). That

---

**2.** The prosecutor based her assertion on a statement by "Detective Jack Broadhead, who indicated to [the prosecutor that Young] had received no leniency on any case in exchange for a position to cooperate with law enforcement on this case." Defense counsel asserted that "[b]y Justice Department standards, [the DEA] must have an agreement in writing stating exactly what they're giving [Young], what they are not." However, neither counsel appeared to have any direct knowledge of the existence or contents of any such agreement.

**3.** Not only did the trial court bar defense counsel from cross-examining Young about his coopera-

tion with the DEA, but the court also appears to have prohibited defense counsel from disclosing Young's DEA work to Chavez.

**4.** Chavez argues that his rights were violated under both the Sixth Amendment to the United States Constitution and under Article I, Section 12 of the Utah Constitution. However, because he makes no separate state constitutional argument and relies almost exclusively on federal case law, we analyze Chavez's claim only under the federal Confrontation Clause. *See Harper v. Summit County*, 2001 UT 10, ¶ 29 n. 12, 26 P.3d 193.

Young had a then-current relationship as an informant with the DEA and that Young was incarcerated at the time he testified in this case are precisely the types of topics appropriately addressed on cross-examination to show possible witness bias. *See Alford v. United States,* 282 U.S. 687, 693, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931) (stating that a criminal defendant is "entitled to show by cross-examination that [a witness's] testimony was affected by fear or favor growing out of [the witness's] detention"); *United States v. Bernal–Obeso,* 989 F.2d 331, 333, 335 (9th Cir.1993) (stating that "[t]he use of informants to investigate and prosecute persons engaged in clandestine criminal activity is fraught with peril," and that "it is essential that relevant evidence bearing on the credibility of an informant-witness be timely revealed ... to the ultimate trier of fact, unless clearly cumulative or attenuated").

■ ¶ 19 Admittedly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, ... the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435. In this case, despite the State's arguments to the contrary, we conclude that cross-examination regarding Young's incarceration and cooperation with the DEA would not have been repetitive nor only marginally relevant. Furthermore, the trial court's prohibition of any examination regarding these topics was not narrowly tailored to protect Chavez's Confrontation Clause rights, even when considered in light of the State's claimed interest in promoting "people's safety."[5]

¶ 20 It is true that defense counsel was allowed to elicit from Young that he had testified for the State at least twenty times previously, that he had a criminal history including felonies involving dishonesty, and that he was then awaiting sentencing for one

of those felonies. The first of these facts concern Young's *history* of cooperation with prosecutors and police; the second surely suggests the likelihood of *prior* incarceration. But in actuality, not only was Young awaiting sentencing for another crime, he was then incarcerated. Not only had Young on prior occasions testified for the State, he was currently acting as an informant for the DEA. These additional facts significantly lengthen the shadow to be cast on Young's credibility and greatly strengthen the suggestion that he had a *then-immediate* motive to lie, potentially undermining his claim that he came forward of his own volition and purely out of a sense of public duty and empathy for the victim.

■ ¶ 21 We hasten to add that a witness's safety or the safety of others is a legitimate basis upon which to limit cross-examination. However, because of the importance of a defendant's confrontation rights, any such safety concerns need to be outlined in detail so the trial court can gauge their validity and consider viable alternatives to restricting cross-examination. In this case the record reveals no such detail about the supposed safety concerns, but only the barest allusion to safety, with the prosecutor merely opining that defense counsel's intended inquiry would "compromis[e] people's safety." The prosecutor did not provide the trial court any specifics to support her claim regarding "people's safety," nor did she assert that disclosure of the DEA investigation risked Young's safety in particular.[6]

### ERROR NOT HARMLESS BEYOND A REASONABLE DOUBT

■ ¶ 22 Having concluded the trial court's ruling was in error, at least given the state of the record before it, we must consider whether the error was harmless beyond a reasonable doubt. *See Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438,

---

5. Despite the general reference at trial to "people's safety," on appeal the State contends its concern was for Young's safety in particular.

6. In any event, "[t]he State could have protected [Young] from exposure of his [cooperation with the DEA] in these circumstances by refraining from using him to make out its case; the State

cannot, [on this record, and] consistent with the right of confrontation, require the [defendant] to bear the full burden of vindicating the State's interest in [protecting a witness's safety]." *Davis v. Alaska,* 415 U.S. 308, 320, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974) (referring to state "interest in the secrecy of juvenile criminal records" rather than to state interest in witnesses' safety).

89 L.Ed.2d 674 (1986); *State v. Hackford,* 737 P.2d 200, 204 (Utah 1987).

Whether such an error is harmless in a particular case depends upon a host of factors ... includ[ing] the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence [corroborating] or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438.

¶ 23 Here, the State had no physical evidence to support the rape charge against Chavez. Its case rested almost exclusively on Amy's and Young's testimony. The jury surely had reason to question Amy's testimony due to her inconsistent statements regarding her need for tampons, the number of Tylenol PM pills she took, Chavez's actions during the alleged incident, and whether his genitals were uncovered, as well as a complete lack of explanation for why she did not initially mention Chavez actually touching her vagina with his penis. Furthermore, Amy's claimed reaction to Chavez's initial advance itself stretches credibility. Amy said that Chavez's kissing her bare back while she slept was not "much of a big deal." Moreover, immediately afterward, she asked her mother to go get her tampons she did not need, which meant Amy would be left in the home with Chavez.

¶ 24 Given the problems with Amy's testimony, it is likely that Young's testimony incriminating Chavez heavily influenced the jury's decision. We are thus unable to conclude beyond a reasonable doubt that defense counsel's cross-examination of Young concerning his *current* incarceration and *ongoing* cooperation with the DEA would not have produced a more favorable outcome for Chavez.

¶ 25 We reverse the conviction and remand for a new trial.[7]

7. Chavez raises other claims in his appeal, including a claim that his right to counsel was infringed upon. *See* note 3. Given our decision, however, we need not address Chavez's other arguments for reversal. The State's motion, left

¶ 26 We Concur: JUDITH M. BILLINGS, Associate Presiding Judge, and PAMELA T. GREENWOOD, Judge.

pending, to strike portions of the reply brief is granted, and in reaching our decision we have not considered the inappropriate material objected to by the State.