**2013 UT App 167**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
PAUL RAYMOND VIGIL,
Defendant and Appellant.

Opinion
No. 20110698-CA
Filed July 5, 2013

Third District, Salt Lake Department
The Honorable Robin W. Reese
No. 101907193

Joel J. Kittrell, Attorney for Appellant
John E. Swallow and Jeanne B. Inouye, Attorneys
for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGE CAROLYN B. MCHUGH concurred. JUDGE GREGORY K. ORME
concurred in the result.

VOROS, Judge:

¶1    Paul Raymond Vigil appeals from his convictions for aggravated kidnapping, rape, and related crimes.[1] On appeal he

---

1. Vigil was convicted of Aggravated Kidnapping, a first degree felony; Rape, a first degree felony; Possession with Intent to Distribute a Controlled Substance, a second degree felony; Distribution/Offering/Arranging the Distribution of a Controlled Substance, a second degree felony; and Unlawful Possession/Purchase/Transfer of a Dangerous Weapon, a class A

(continued...)

contends that the trial court erred by denying his request to recall the victim, J.B., for a third cross-examination. We affirm.

BACKGROUND

¶2 In September 2010, J.B. asked Vigil, who had previously sold drugs to her, for a ride from the airport to a friend's house. Vigil picked her up but drove her to his home rather than to the friend's house. J.B. repeatedly asked Vigil to take her to the friend's house but ended up staying at Vigil's house. While there, both she and Vigil took drugs. Several days later, J.B. told Vigil she was leaving. Vigil became angry, raped J.B., then emptied her wallet while she was getting dressed. J.B. got a ride to a different friend's house and reported the rape.

¶3 J.B. left Utah for an out-of-state drug treatment center but returned to testify at Vigil's trial. On the first day of trial, she was called to the stand as a witness for the State. As relevant here, she testified that she had arrived in Utah the day before trial and had gone to Temple Square with a care provider from the treatment center. On cross-examination, J.B. denied that she had visited a defense witness (Witness), denied giving Witness money, and denied asking Witness for drugs.

¶4 On the second day of trial, J.B. was recalled to the stand by the State and admitted that her prior testimony about the night before trial had not been accurate. She admitted that the care provider had not accompanied her and that she had returned to her hotel before reaching Temple Square. But she reaffirmed her testimony about the events giving rise to the charges against Vigil. On cross-examination, J.B. again denied that she had visited Witness the night before trial.

---

1. (...continued)
misdemeanor. *See* Utah Code Ann. §§ 58-37-8(1)(a)(ii), -8(1)(a)(iii) (LexisNexis 2008); *id.* § 76-5-302; *id.* § 76-5-402; *id.* § 76-10-503(3)(b).

¶5     On the third day of trial, the prosecutor disclosed to the court and defense counsel that she had talked to the hotel bus driver the previous evening. The bus driver told her that on the night before trial a young woman, possibly J.B., had ridden the bus to a location near Witness's house. The judge, prosecutor, and defense counsel discussed recalling J.B. again to cross-examine her about the falsity of her prior testimony on this point. They recognized that if J.B. denied riding the bus, defense counsel would seek to impeach J.B. by calling the hotel bus driver to testify. However, neither the prosecutor nor defense counsel could reach the hotel bus driver despite placing "dozens" of calls. As a result, the trial judge requested that the prosecutor and defense counsel consider stipulating that J.B. had testified falsely on this point.

¶6     The State was willing to enter into such a stipulation, but Vigil wanted to recall J.B. The State objected to recalling J.B. and the trial court sustained the objection, noting "It seems to me that the defense gets everything they want out of the stipulation." Accordingly, the State's stipulation was read to the jury. The stipulated facts were (1) that J.B.'s revised testimony about her whereabouts on the night before trial was false and (2) that J.B. had visited Witness's neighborhood.

¶7     Later that day Witness took the stand. She testified that J.B. came to her house the night before trial looking for drugs. Vigil did not ask Witness whether J.B. had offered her money in an attempt to influence her trial testimony.


ISSUES AND STANDARDS OF REVIEW

¶8     Vigil contends that his "rights under the Confrontation Clause were violated because he did not have the opportunity to cross-examine the complaining witness about her motives for lying twice under oath about visiting one of the key witnesses" whose testimony was contrary to hers. "When reviewing a trial court's decision to limit cross-examination, we review the legal rule applied for correctness and the application of the rule to the facts

of the case for an abuse of discretion." *State v. Chavez*, 2002 UT App 9, ¶ 17, 41 P.3d 1137.[2]

¶9    Vigil also contends that the "trial court erred when it denied [his] motion for a new trial." "[T]he trial court's decision to deny [a] defendant's motion for new trial is reviewed under an abuse of discretion standard." *State v. Evans*, 2001 UT 22, ¶ 26, 20 P.3d 888. However, "we review the legal standards applied by the [trial] court in denying [a] motion [for a new trial] for correctness." *State v. Allen*, 2005 UT 11, ¶ 50, 108 P.3d 730.

ANALYSIS

I. Confrontation Clause

¶10    Vigil first contends that the trial court's denial of his request to recall J.B. to the stand for a third time resulted in a violation of his Confrontation Clause rights. "The Sixth Amendment to the United States Constitution states in relevant part, 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .'" *State v. Marks*, 2011 UT App 262, ¶ 13 n.6, 262 P.3d 13 (omissions in original) (quoting U.S. Const. amend. VI). Nevertheless, a defendant's Sixth Amendment right to confront his accuser "is not absolute," *State v. Tarrats*, 2005 UT 50, ¶ 36, 122 P.3d 581, and "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process," *Michigan v. Lucas*, 500 U.S. 145, 149 (1991) (citation and

---

2. Although Vigil cites the Utah Constitution, he undertakes no separate state constitutional analysis. Where an appellant "neither attempts any separate state constitutional analysis nor suggests that the two constitutional protections are anything but coextensive" but merely restates the "truism" that a state constitutional provision may provide greater protections to Utah citizens than its federal counterpart, the state constitutional issue is not properly before the reviewing court. *State v. Worwood*, 2007 UT 47, ¶ 19, 164 P.3d 397.

internal quotation marks omitted). Thus, "trial judges retain wide latitude to limit reasonably a criminal defendant's right to cross-examine a witness based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* (citation and internal quotation marks omitted).

¶11 "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness . . . ." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986); *see also Chavez*, 2002 UT App 9, ¶ 18. Even if a defendant does so, the Supreme Court has "repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 681; *see also Chavez*, 2002 UT App 9, ¶ 22 (stating that where we conclude that a trial court committed a Confrontation Clause error, "we must [then] consider whether the error was harmless beyond a reasonable doubt").[3] Accordingly, upon a showing of Confrontation Clause error, reversal is required unless a reviewing

---

3. Every federal circuit has continued to apply the harmless beyond a reasonable doubt standard to Confrontation Clause errors after the issuance of *Crawford v. Washington*, 541 U.S. 36 (2004), which defined Confrontation Clause error without addressing harm. *See, e.g., United States v. Rosalez*, 711 F.3d 1194, 1217–18 (10th Cir. 2013); *United States v. Turner*, 709 F.3d 1187, 1194–95 (7th Cir. 2013); *United States v. Heard*, 709 F.3d 413, 433 (5th Cir. 2013); *United States v. Cameron*, 699 F.3d 621, 652 (1st Cir. 2012); *United States v. Bustamante*, 687 F.3d 1190, 1195 (9th Cir. 2012); *United States v. Summers*, 666 F.3d 192, 204 (4th Cir. 2011); *United States v. Mueller*, 661 F.3d 338, 349 (8th Cir. 2011); *United States v. Moore*, 651 F.3d 30, 74 (D.C. Cir. 2011); *United States v. Treacy*, 639 F.3d 32, 45 (2d Cir. 2011); *United States v. Henderson*, 626 F.3d 326, 333–35 (6th Cir. 2010); *United States v. Jones*, 601 F.3d 1247, 1264 (11th Cir. 2010); *United States v. Hardwick*, 544 F.3d 565, 573–74 (3d Cir. 2008).

court determines that the error was harmless beyond a reasonable doubt.

¶12 Assuming without deciding that the trial court erred by refusing to recall J.B. to the stand, we turn to the second part of this test. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684. A reviewing court considers "a host of factors," including "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* For convenience, we refer to these as the *Van Arsdall* factors.

¶13 Vigil contends that the denial of a third cross-examination harmed him in two ways. He asserts that had he been able to cross-examine J.B. again "[1] the jury could have become aware of [J.B.'s] true intentions for going to [Witness's] house the night before trial, and [2] the jury would have had the seriousness of [J.B.'s] second perjured testimony more memorable in their minds."

¶14 We first consider the "importance of the witness'[s] testimony in the prosecution's case." *Id.* Vigil argues that his conviction "rests almost exclusively on [J.B.'s] testimony. Because of that, it is very likely that [her] testimony heavily influenced the jury's decision." J.B. was, of course, the key prosecution witness to the facts supporting the elements of the charged crimes. In this sense, her testimony was of ultimate importance. However, Vigil had and took full opportunity to cross-examine J.B. concerning the facts supporting the elements of the crimes. Vigil was prevented from cross-examining J.B. only about the two facts stipulated to: (1) that J.B. went to Witness's neighborhood on the night before trial and (2) that J.B.'s earlier testimony about her whereabouts on that night was false. Accordingly, our evaluation of harmlessness

is limited to the damaging potential of cross-examination on those topics.

¶15    With respect to J.B.'s intent, Vigil points out that J.B. lied about where she went the night before trial during both cross-examinations. As a result, the "defense never had the opportunity" to cross-examine her "regarding the reasons for [her] perjury and late-night visit to an opposing witness." Vigil suggests that, given the chance to cross-examine J.B. after "hard evidence of her whereabouts finally emerged," he "might have revealed her reasons for visiting [Witness], including offering money in exchange for favorable testimony."

¶16    Vigil did not, in fact, have the chance to cross-examine J.B. after it was revealed that she had been dropped off in Witness's neighborhood. But "[a]n assessment of harmlessness cannot include consideration of whether the witness'[s] testimony would have been unchanged . . . ; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." *Coy v. Iowa*, 487 U.S. 1012, 1021–22 (1988). Accordingly, we will not speculate on what testimony Vigil might have been able to elicit from J.B. during a third opportunity for cross-examination and turn, instead, to the remaining evidence.

¶17    Immediately after the stipulation was read to the jury, Vigil called Witness to the stand. Her testimony reinforced the substance of the stipulation. She testified that J.B. had visited her the night before trial and that J.B. had asked for drugs. Witness did not mention any attempt by J.B. to offer her money in exchange for favorable testimony. Tellingly, Vigil did not ask Witness about the very allegation that he now asserts on appeal—that J.B. attempted to influence Witness's trial testimony. As a result, no record evidence shows or even implies such an attempt. Although our analysis must assume that any damaging potential of cross-examination would have been fully realized, *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), we may not assume the existence

of verdict-altering testimony in the absence of any evidentiary support.[4]

¶18 We look next to whether the excluded testimony was cumulative. *Id.* Vigil claims that he never had the opportunity to cross-examine J.B. about her intent in visiting Witness. But under cross-examination during the first day of trial, J.B. testified that she did not offer Witness money or ask Witness for drugs on the night before trial.[5] Witness, in contrast, testified that J.B. visited her the night before trial seeking drugs. If cross-examined again on this point, J.B.'s testimony would likely have been cumulative either of her earlier testimony or of Witness's testimony. Accordingly, cross-examination of J.B. regarding her intent in visiting Witness would likely have been cumulative.

¶19 Vigil also argues that cross-examining J.B. a third time would have more memorably etched the falsity of J.B.'s prior testimony into the minds of the jury. He claims that the "parties' stipulations to the bare facts of [J.B.'s] use of the hotel shuttle to go to an area near [Witness's] house is not sufficient to impress upon the jury the seriousness of her perjury." In this regard, Vigil does not assert that the trial court's ruling excluded substantive evidence. Instead, he complains in effect that he was deprived of the "opportunity of profiting from the legitimate moral force of [J.B.'s false testimony] in persuading [the] jury." *See State v.*

---

4. Were it otherwise, a defendant could always speculate that, given more time or greater latitude in conducting cross-examination, he might have eventually discovered some fact damaging to the credibility of a witness.

5. Although some of J.B.'s testimony on the first day of trial was false, we do not infer from that fact that her other testimony, much of which the jury apparently found credible, was also false. *Cf. State v. Marks*, 2011 UT App 262, ¶ 64, 262 P.3d 13 (noting that evidence of perjury about one topic at a preliminary hearing is not a fact supporting an inference of perjury about a second topic testified to at trial).

*Gulbransen*, 2005 UT 7, ¶ 37, 106 P.3d 734 (holding that a stipulation of fact by the defense did not make evidence of that fact less relevant). Indeed, presumably for this very reason, a plurality of the Utah supreme court has held that, "[a]s a general rule, a party may not preclude his adversary's offer of proof by admission or stipulation." *State v. Bishop*, 753 P.2d 439, 475 (Utah 1988) (plurality opinion), *overruled on other grounds by State v. Menzies*, 889 P.2d 393 (Utah 1994). We thus consider the potential prejudice of this limitation on Vigil's cross-examination.

¶20 Despite this limitation, the jury was made aware of the underlying facts by means of the stipulation. And Vigil freely addressed J.B.'s perjury in closing argument. Vigil stated, "What we do know for fact is that [J.B.] has been deceptive. She has testified falsely on multiple occasions." Defense counsel reiterated that, on the second day of trial, J.B. "acknowledged . . . she wasn't truthful about everything on the [first day of trial]. [And she] acknowledg[ed] today she wasn't truthful . . . yesterday about what happened on the [night before trial]." Because the jury was thus aware of the reasons they might doubt J.B.'s credibility, we conclude that Vigil had the opportunity to profit from the legitimate moral condemnation of J.B.'s perjury. *See Gulbransen*, 2005 UT 7, ¶ 37; *cf. State v. Marks*, 2011 UT App 262, ¶ 67, 262 P.3d 13 (discerning no Confrontation Clause error where the defense had a "reasonable opportunity to adequately explore, by alternative methods," the credibility of a witness). The trial court's ruling thus did "not preclude the defendant from effectively challenging the credibility of the victim"; Vigil had "a reasonable opportunity to adequately explore, by alternative methods, the substance of his complaints regarding the veracity of the victim's allegations." *State v. Quinonez-Gaiton*, 2002 UT App 273, ¶ 17, 54 P.3d 139.

¶21 We also consider the "presence or absence of evidence corroborating or contradicting the testimony of the witness on material points." *Van Arsdall*, 475 U.S. at 684. As noted above, J.B.'s testimony was central to proving the charged offenses. However, other evidence corroborated her testimony.

¶22   With regard to kidnapping and rape, J.B. testified that when she tried to leave Vigil's apartment, he shut the door and told her that she was not going anywhere. J.B. also testified that Vigil threw her on the floor and raped her. These facts were corroborated by the testimony of the apartment manager that J.B. emerged from Vigil's apartment "bawling" and asked him for a ride. The responding police officer testified that J.B. appeared traumatized. Another witness testified that J.B. was "crying real badly like she couldn't breathe." And the examining nurse testified that J.B. had bruises and abrasions on her shoulders, arms, back, legs, and genitals.[6] Moreover, although Vigil denied having had even consensual sex with J.B., DNA that was almost certainly Vigil's was found on her breast and inside her underwear.[7]

¶23   Turning to the drug and weapon charges, J.B. testified that Vigil gave her drugs in his car and at his apartment. She also testified that Vigil sold drugs to other people during this time period. The police officer who arrested Vigil corroborated this testimony when he testified that Vigil was found with several types of narcotics and an improvised weapon. Moreover, Vigil admitted to a police officer that he had given heroin to J.B.

¶24   Thus, while J.B.'s testimony formed the basis of the case against Vigil, her testimony was corroborated by other evidence.[8] In fact, the only charge Vigil was acquitted of—robbery—was also the only charge that rested solely on the testimony of J.B. Thus, other evidence at least inferentially corroborated J.B.'s testimony on all key points.

---

6. Vigil points to testimony that J.B.'s genital bruising could also have been consistent with consensual sex. However, no one testified that Vigil and J.B. engaged in consensual sex.

7. The laboratory technician who processed the recovered DNA placed the approximate odds of a source other than Vigil at approximately one in 17 quadrillion (17,000,000,000,000,000).

8. Vigil does not challenge the testimony of any witness other than J.B.

¶25    We turn next to the "extent of cross-examination otherwise permitted." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). As explained above, Vigil cross-examined J.B. about almost all of her testimony. He was prevented from cross-examining her only about the two facts stipulated to—that J.B. visited Witness's neighborhood the night before trial and that J.B.'s earlier testimony about her whereabouts that night was false. Vigil was thus permitted extensive cross-examination of J.B.

¶26    Another factor in our analysis is "the overall strength of the prosecution's case." *Id.* We agree with Vigil that J.B.'s credibility was the linchpin of the State's case. But this was not a mere "he-said-she-said credibility contest between the alleged perpetrator and the victim" such as a "rape case where the sole issue at trial is consent." *State v. Lenkart*, 2011 UT 27, ¶ 42, 262 P.3d 1. As explained above, J.B.'s testimony on key points was corroborated by the testimony of other witnesses, scientific evidence, or both. For example, DNA evidence corroborated her version of events and contradicted Vigil's statement to police that he had not engaged in sexual activity with J.B. Thus, while the State's case was far from overwhelming and J.B.'s credibility was challenged at trial, the evidence as a whole supports the jury's verdict.

¶27    After considering the factors enumerated in *Van Arsdall*, we conclude that any Confrontation Clause error by the trial court in denying Vigil's request to cross-examine J.B. a third time was harmless beyond a reasonable doubt. Specifically, J.B.'s testimony was important to the case but was also corroborated by other, uncontested evidence; Vigil was permitted to cross-examine J.B. about the large majority of her testimony; the denied cross-examination would likely have been cumulative; the jury was made aware of the untruthfulness of J.B.'s testimony by stipulation; and the State's case was relatively strong. *See Van Arsdall*, 475 U.S. at 684.

II. Motion for New Trial

¶28   Vigil also contends that the trial court erred when it denied his motion for a new trial. The Utah Rules of Criminal Procedure provide that a "court may . . . grant a new trial in the interest of justice if there is any error or impropriety which had a substantial adverse effect upon the rights of a party." Utah R. Crim. P. 24(a). For the purposes of our analysis in Part I, we assumed, without deciding, that an error occurred. However, we concluded that any error was harmless beyond a reasonable doubt. It follows that an error that is harmless beyond a reasonable doubt cannot have had a "substantial adverse effect upon the rights of a party." *See id.* Consequently, any possible error in denying Vigil's motion for new trial was harmless.

CONCLUSION

¶29   Vigil was able to cross-examine J.B. about every fact adduced from her at trial except her false statement regarding her whereabouts on the night before trial. Vigil has not shown that the trial court's decision not to recall J.B. to the stand resulted in the exclusion of substantive evidence nor are we convinced that he was prevented from fully arguing that J.B.'s perjuries tainted her credibility as a witness. Moreover, while J.B.'s testimony was important to the case against Vigil, it was corroborated by the testimony of other witnesses. Therefore, after considering the *Van Arsdall* factors, we conclude that any Confrontation Clause error was harmless beyond a reasonable doubt. And because any underlying error was harmless beyond a reasonable doubt, any error in denying Vigil's motion for a new trial was likewise harmless.

¶30   Affirmed.

—————