**2019 UT App 169**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
EDDIE A. SALAZAR,
Appellant.

Opinion
No. 20171019-CA
Filed October 18, 2019

Third District Court, Salt Lake Department
The Honorable Keith A. Kelly
No. 171901573

Andrea J. Garland, Attorney for Appellant

Sean D. Reyes, Nathan D. Anderson, and Lindsey L.
Wheeler, Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES KATE APPLEBY and DIANA HAGEN concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Eddie A. Salazar was convicted by a jury of burglary and theft. He now appeals, seeking a new trial. We affirm.

## BACKGROUND[1]

¶2      On July 6, 2015, Salazar and his wife (Wife) drove Steve Young, whom they had just met that day, to a house in Cottonwood Heights, Utah. When they arrived at the house, Young got out of the car and knocked on the front door. When no one answered, Young climbed over the fence to the backyard and kicked in the basement door. Once inside, Young stole sunglasses, a money clip, a microcassette recorder, jewelry, and some medication that he hoped to be painkillers. While Young was inside the house, a witness (Witness) observed a car slowly driving up and down the road in front of the house. Witness noted that the driver had his seat leaning back and that the car was not in the normal lane of traffic but was "against the curb." Young then ran from the side of the house, got in the car, and "told [Salazar] to hurry up."

¶3      Witness saw the car speed up to meet Young as he ran from the house, noting that the car "sped off" once Young "jumped in the car." Witness followed the car in his truck and called the police. Young noticed the truck, and he suspected that Witness was "probably going to come and try to get [his] property back." Young first testified that he told Salazar and Wife that he "stole some stuff," but he later clarified that he told Salazar and Wife, "[T]hese guys [in the truck] are going to come beat me up because I got my stuff out of the house," implying that he had retrieved only his own property.[2] Witness described

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Heaps*, 2000 UT 5, ¶ 2, 999 P.2d 565.

2. Young later contradicted himself, stating that he did not tell Salazar and Wife that he stole items from the house but that he

(continued…)

Salazar's driving as "erratic" and "reckless," and he eventually stopped following the car because Salazar "was speeding . . . faster than what [he] thought was safe."[3]

¶4 Salazar then pulled into a nearby gas station. Young handed Wife the pills that he had just stolen and asked her to throw them away. Young said he did not tell Wife that they were stolen or the reason he wanted her to throw them away, just that he "didn't want them." Surveillance footage from the gas station showed Young reaching out of the car and handing something to Wife as she got out of the car. The footage then showed Wife walk to a trash can and throw something away. Later that same day, the police recovered prescription pills—with the name of the homeowner whose house Young burglarized—from the same gas station trash can depicted in the surveillance video.

¶5 A detective, who heard a report of the burglary, observed a vehicle with three occupants matching the description given by dispatch. The detective stopped that vehicle, and Witness joined the detective to confirm that the car and its three occupants were those whom Witness had seen fleeing the burglarized house. After advising them of their *Miranda* rights,[4] the detective interviewed Salazar, Wife, and Young.

---

(…continued)
"told them [he] was getting [his] stuff and that [he] believe[d] these people were going to harm [him] for stealing [his] stuff back."

3. Young testified that Salazar did not start driving faster when they noticed they were being followed by the truck.

4. *Miranda v. Arizona*, 384 U.S. 436 (1966), outlines the warnings police are required to give suspects subjected to custodial interrogation. *Id.* at 479.

¶6     Salazar told the detective that he drove Young to the house, after which Young "exited the car and was gone for a few minutes." Salazar said that when Young returned he was "carrying some items." Salazar said he was unsure what Young was doing in the house, but he "assumed that [Young] had stolen something." As they were driving away from the house, Salazar said he "observed a vehicle that he believed was following him or chasing him," so "he then began to drive a little faster in an attempt to lose the tailing vehicle." Salazar said that they then stopped at a gas station for fuel.

¶7     Wife's account, with the addition of some details, largely corroborated Salazar's account. Wife referred to Young as their "friend." Wife confirmed that after arriving at the gas station, Young handed her some pills, which she thought belonged to the homeowner and which she discarded.

¶8     Young initially told the detective that Salazar and Wife had just picked him up at the gas station, but after being confronted with Salazar's and Wife's accounts of the event, Young admitted to breaking into the house and "looking for items to steal." The State charged Salazar with one count of burglary and one count of theft. Wife died before trial, and therefore she did not have the opportunity to testify at trial.

¶9     At Salazar's trial, Young appeared as a witness for the defense and provided additional details to the story. Young testified that he met Salazar and Wife the same day that they drove him to the house he burglarized. Young had been at his sister's house because he "got kicked out of the place [he] was staying." Young's sister and Wife were friends, and Wife and Salazar were visiting Young's sister at her house the morning of the theft and burglary. Young testified that he asked Wife for a ride, telling her he "needed to go to a house that [he] was renting . . . to get [his] stuff from there." Young admitted that he asked Wife to throw out the pills at the gas station, but he testified that neither Salazar nor Wife knew anything about the burglary.

¶10    At trial, the State sought to introduce the statements Wife made to the detective. Salazar objected, arguing that the evidence was inadmissible hearsay that violated his constitutional right to confront the witnesses against him at trial. The trial court admitted the evidence of Wife's statements to the detective, and the jury ultimately convicted Salazar as charged. Salazar appeals.

## ISSUE AND STANDARD OF REVIEW

¶11    Salazar contends that the trial court's admission of Wife's statements to the detective violated the Confrontation Clause of the Sixth Amendment.[5] "Whether a defendant's confrontation rights have been violated is a question of law, reviewed for correctness." *State v. Garrido*, 2013 UT App 245, ¶ 9, 314 P.3d 1014. However, we will not reverse a constitutional error if "we find the error harmless beyond a reasonable doubt." *State v. Calliham*, 2002 UT 86, ¶ 45, 55 P.3d 573.

## ANALYSIS

¶12    Salazar seeks a new trial, contending that the trial court violated his right to confront and cross-examine a witness when it allowed Wife's hearsay statements to substitute for in-court testimony. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the

---

5. Salazar also argues that the admission of Wife's statements to the detective violated rule 804(b)(3) of the Utah Rules of Evidence because they were hearsay. Because we conclude that the error in admitting Wife's statements in violation of the Confrontation Clause was harmless beyond a reasonable doubt, we do not address this alternative claim.

witnesses against him." U.S. Const. amend. VI. The State concedes, and we agree, that the admission at trial of Wife's pretrial statements to the detective violated Salazar's right to confront Wife because her statements were testimonial in nature, she did not appear at trial, and Salazar had no prior opportunity for cross-examination.[6] *See Crawford v. Washington*, 541 U.S. 36, 68 (2004).

¶13 Even when, as here, a defendant demonstrates a Confrontation Clause violation, the United States Supreme Court has "repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *State v. Vigil*, 2013 UT App 167, ¶ 11, 306 P.3d 845 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)). Whether an error was harmless beyond a reasonable doubt depends on several factors, namely, "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684; *accord State v. Villarreal*, 889 P.2d 419, 425–26 (Utah 1995). Salazar presents three arguments to support his position that Wife's pretrial statements were important to the State's case and that their introduction at trial was therefore not harmless beyond a reasonable doubt. We address each of Salazar's harmfulness arguments in turn.

---

6. Had Wife been available and able to testify at trial—for the State or as a defense witness—both parties would have had the opportunity to cross-examine her.

## I. Wife's Reference to Young as a Friend

¶14     First, Salazar contends that Wife referring to Young as Salazar's and her "friend suggested an affiliation between Young and the Salazars that was found nowhere else in the record." He asserts that the use of the word "friend" was "evidence of association, [was] probative of the couple's relationship with Young, and implied collusion between the three of them." However, the jury could have relied on other evidence presented at trial to conclude that Salazar and Wife had an affiliation with Young. For example, Young testified that his sister was "good friends" with Wife. Additionally, contrary to Salazar's assertion, it is unlikely that the jury gave much weight to the use of the word "friend," because its meaning can vary depending on its context. It can denote "one attached to another by affection or esteem," an "acquaintance," or even "one that is not hostile." *See Friend*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/friend [https://perma.cc/Z7CU-WPTQ]; *see also Ware v. Rodale Press, Inc.*, No. COV/A/95-5870, 1998 WL 409014, at *2 (E.D. Pa. June 23, 1998) ("One recognizes that the term 'good friends' is susceptible to various gradations of meaning."); *Law Offices of Herssein & Herssein, PA v. United Services Auto. Ass'n*, 271 So. 3d 889, 894 (Fla. 2018) ("In the traditional sense, a friend is a person attached to another person by feelings of affection or esteem. But friendship in the traditional sense of the word does not necessarily signify a close relationship. It is commonly understood that friendship exists on a broad spectrum: some friendships are close and others are not. Thus the mere existence of a friendship, in and of itself, does not inherently reveal the degree or intensity of the friendship." (quotation simplified)).

¶15     Furthermore, even if the reference to Young as a "friend" is not cumulative or corroborated, any friendship between the Salazars and Young is not the critical analysis here, because friendship is not an element of burglary or necessarily indicative of being an accomplice. Salazar argues that his "relationship to

Young as a party to the charged offenses was an element of both crimes." But improperly admitted "factual statements" are "harmless beyond a reasonable doubt" if they are "either unnecessary to prove the elements of the crimes charged or were supported by other evidence at trial." *State v. Farnworth*, 2018 UT App 23, ¶ 26, 414 P.3d 1053. Simply put, Salazar having a friendship with Young is not an element of burglary, and the burglary conviction was supported by other evidence at trial. In regard to accomplice liability, Utah law does not require a friendship in order for an accomplice to be convicted for the same offense. *See State v. Comish*, 560 P.2d 1134, 1136 (Utah 1977) ("[A]n 'accomplice' is one who participates in a crime in such a way that he could be charged and tried for the same offense."). While a friendship between two persons may be probative of the intent of an accomplice, certainly two persons may be accomplices in the absence of friendship. Wife's reference to Young as a "friend" did not go "to the heart of what the jury was being asked to decide," because the relationship between Salazar and Young is not an element of the crime. *See State v. Larrabee*, 2013 UT 70, ¶ 36, 321 P.3d 1136. The jury was asked to decide if Salazar was "a party to the offense," and there was ample admissible evidence presented to the jury that suggested that Salazar was "a party to the offense." *See infra* Part III. Accordingly, we determine that the trial court's admission of Wife's testimony referring to Young as Salazar's and her friend was harmless beyond a reasonable doubt.

## II. Wife's Statement About the Pills

¶16    Second, Salazar contends that Wife's statement to the detective that "Young provided her a bag of prescription pills and directed her to discard the pills in the garbage can at [the gas station]" "invited the jury to base inferences of Salazar's knowledge on [Wife]'s actions." Additionally, Salazar argues that this evidence was important to the State's case because it was referenced in the State's closing argument. "Where evidence admitted in violation of defendant's right to confrontation is

merely cumulative, it may be deemed harmless beyond a reasonable doubt." *State v. Calliham*, 2002 UT 86, ¶ 46, 55 P.3d 573. Evidence is "merely cumulative" if "others also testified to essentially the same facts." *State v. Oniskor*, 510 P.2d 929, 931 (Utah 1973). For example, in *Oniskor* the defendant killed a woman and stole some of her belongings, including a unique ring and keys. *Id.* at 930. A few days later, the defendant was arrested with the ring and keys on his person. *Id.* At a preliminary hearing, one witness testified that he observed the defendant wearing the ring before he was arrested and another witness—a medical examiner—expressed his opinion as to the cause of death. *Id.* At trial, because the two witnesses were out of the state, the court permitted the jury to hear the testimony of the witnesses from the preliminary hearing. *Id.* On appeal, the defendant argued that his right to confrontation was violated. *Id.* The court concluded that to permit the jury to hear the evidence was a harmless error, observing that the testimony "was merely cumulative since others also testified to essentially the same facts." *Id.* at 931.

¶17    Here, Wife's testimony that Young directed her to throw out the pills was cumulative of other evidence in the record. At trial, Young testified that he asked Wife to throw out the pills and that Wife did indeed throw out the pills. Additionally, surveillance footage showed Young reach out from inside a car and hand something to Wife, which she took and placed in a trash can. Later that same day, the police recovered the pills, prescribed to the homeowner whose house Young burglarized, from the same gas station trash can. In light of Young's testimony, the surveillance footage, and the police's recovery of the pills, we conclude that Wife's testimony on this matter was cumulative and was harmless beyond a reasonable doubt.

### III. The Strength of the State's Case

¶18    Third, Salazar argues that the overall strength of the State's case was not so overwhelming as to make the

constitutional error harmless beyond a reasonable doubt. Wrongfully admitted evidence is harmless beyond a reasonable doubt if it is "cumulative and . . . the untainted proof of the defendant's guilt [is] overwhelming." *Delaware v. Van Arsdall*, 475 U.S. 673, 682 n.5 (1986); *see also State v. Oniskor*, 510 P.2d 929, 931 (Utah 1973) (stating that when "other evidence against defendant [is] overwhelming[,] . . . this court is compelled to conclude beyond a reasonable doubt that the denial of defendant's rights constituted harmless error"). "To show that a defendant is guilty under accomplice liability, the State must show that an individual acted with both the intent that the underlying offense be committed and the intent to aid the principal actor in the offense." *State v. Briggs*, 2008 UT 75, ¶ 13, 197 P.3d 628. "[I]t is not necessary for the accomplice to have the same [mental state[7]] that the principal actor possessed as long as the accomplice intended that [the underlying] offense be committed." *Id.* ¶ 14. Criminal intent "may be inferred from circumstances such as presence, companionship, and conduct before and after the offense." *Id.* ¶ 13 (quotation simplified).

¶19    Here, Salazar contends that without Wife's statements to the detective, the State's case was insufficient to prove that he had the requisite intent to commit burglary or theft, maintaining that he did not know Young's true intentions. Salazar supports this contention by pointing to Young's testimony that "not only was Salazar unaware that Young had [burglarized] the home but Young provided Salazar a reasonable explanation for Witness

---

7. The original language in *State v. Briggs*, 2008 UT 75, 197 P.3d 628, uses the word "intent" as opposed to "mental state." *See id.* ¶ 14. Our supreme court has clarified that "'intent,' as used in this context, is a legal term of art that means the state of mind accompanying an act. It should not be confused with the mental state designated as 'intentionally.'" *State v. Jeffs*, 2010 UT 49, ¶ 43, 243 P.3d 1250 (quotation simplified).

following them" when he said, "I think these guys are going to come beat me up because I got my stuff out of the house." Additionally, Salazar argues that the State's case was insufficient because the detective "did not observe Salazar committing any crime, including speeding or reckless driving."

¶20    Contrary to Salazar's contention, the State did not need Wife's statements to demonstrate to the jury that Salazar had the requisite intent to commit burglary or theft. The evidence that Salazar was "a party to the offense," even absent Wife's statements, was substantial. Young admitted that he committed both burglary and theft. Salazar did not dispute that he drove Young to and from the house where Young committed these crimes. While Young was in the house, Witness observed Salazar driving slowly up and down the road outside the normal lane of traffic and with his seat leaning back. When Young came running to the road from the backyard, Witness testified that Salazar sped up to meet Young and that Salazar "sped off" after Young "jumped in the car." When Salazar noticed Witness following them, he sped up, and his driving was described as "erratic" and "reckless." Salazar also admitted that he drove "faster in an attempt to lose the tailing vehicle." While Young testified that Salazar did not know his true intentions, when the detective asked Salazar if he knew what Young was doing in the house, Salazar said that he "assumed that [Young] had stolen something."

¶21    Given Salazar's presence at the scene of the crime; his conduct before and after the offenses; his association with Young, who admitted to burglary and theft; and his admission that he was operating under the assumption that a theft occurred, sufficient evidence apart from Wife's statements was presented at trial which allowed the jury to infer that Salazar had the requisite criminal intent. *See id.* ¶¶ 13–14. Accordingly, we determine that the admission of Wife's statements to the detective in violation of the Confrontation Clause was harmless beyond a reasonable doubt.

CONCLUSION

¶22    We conclude that (1) Wife's pretrial statements to the detective were not necessary to prove the elements of the crimes for which Salazar was charged, (2) Wife's statements were cumulative of other evidence presented to the jury, and (3) the State presented sufficient evidence, apart from Wife's statements to the detective, allowing the jury to infer that Salazar had the requisite criminal intent to commit the crimes for which he was charged. In light of these determinations, we conclude beyond a reasonable doubt that Salazar was not prejudiced by the admission of Wife's statements.

¶23    Affirmed.

_____