2023 UT App 19

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
NEAL OGDEN EDDINGTON,
Appellant.

Opinion
No. 20180597-CA
Filed February 16, 2023

First District Court, Logan Department
The Honorable Kevin K. Allen
The Honorable Angela Fonnesbeck
No. 171101138

Ann M. Taliaferro, Attorney for Appellant

Sean D. Reyes and John J. Nielsen,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Neal Ogden Eddington was convicted by a jury of sexual battery and object rape but acquitted of more serious charges, including rape, aggravated sexual assault, and aggravated kidnapping. Prior to trial, the prosecution employed Utah's rape shield rule—rule 412 of the Utah Rules of Evidence—to obtain a pretrial ruling barring Eddington from asking questions about or remarking on his alleged victim's prior sexual behavior or sexual disposition. At trial, the State turned these rulings into a sword, asserting in an opening statement that Eddington took his alleged victim's "virtue" and then eliciting testimony from her that she was not the kind of girl who invites guys into her bedroom or

engages in certain sexual activity. When Eddington attempted to cross-examine the alleged victim about her statements, the trial court cut off the attempt, citing its earlier ruling. Eddington now challenges the court's ruling, given the change in circumstances at trial. He additionally claims his counsel was ineffective for failing to seek admission of and question the alleged victim about known evidence. We agree that the trial court exceeded its discretion in barring Eddington from the cross-examination requested under the facts of this case and further determine that Eddington's counsel rendered ineffective assistance. We therefore vacate his convictions and remand this matter for a new trial.

BACKGROUND

¶2     Eddington met Emily[1] on an ostensibly religious-oriented dating app, and they decided to meet in person for dinner. Afterward, they went to Emily's apartment, which she shared with several roommates, to watch a movie. Eddington wanted to watch the movie in Emily's bedroom, but she declined that invitation. Instead, they watched it in Emily's living room and consensually kissed on the couch during the movie. After the movie ended, Eddington asked to talk privately with Emily, so the two went together to Emily's bedroom. This is where their stories diverge.

¶3     According to Emily, Eddington "immediately" grabbed her "by the neck" and threw her onto the bed. He squeezed her throat, ripped her jeans in half, "ripped off [her] bra," and fondled and kissed her breasts. He "flipped [her] over onto [her] stomach" and started kissing her lower back and buttocks. Emily asked Eddington to stop because she "didn't want to and that wasn't the person [she] was." He vaginally penetrated her with his fingers and tried to put his penis in her vagina but stopped when she resisted. He then forced her to perform oral sex on him several times. Although Emily told him "no" at least twenty times, he

---

1. A pseudonym.

refused to stop, repeatedly telling her that it was her "fault" because she was "so beautiful." Eventually, Emily relented to the activity and pretended she was "okay with it" so that Eddington would not hurt her.

¶4 At one point during the evening, Emily's roommate came to the bedroom door with Emily's dog. The roommate asked if everything was okay, and Emily responded in the affirmative; she explained that she did so because Eddington was standing right behind her and she was scared that Eddington would harm her or her roommates. In addition, one of Emily's roommates sent her a text message early in the morning asking if Eddington was still in Emily's bedroom and if everything was okay. According to Emily, Eddington forced her to unlock her phone so he could read the messages and told Emily to respond "that everything was fine and [she] made him sleep on the floor." Emily also left her bedroom at some point during the night to use the bathroom. When Emily came out of the bathroom, Eddington was waiting for her right outside the door and the two went back into Emily's bedroom.

¶5 Eddington does not deny that Emily performed oral sex on him several times during the eight hours they spent together in Emily's bedroom or that he inserted his fingers into her vagina, but he maintains that the entire encounter was consensual. He also admits that he "made advancements toward intercourse" but claims that he stopped when Emily objected.

¶6 The next morning after Eddington left the apartment, Emily told her roommate "that things went well" and that "she might be seeing him again." However, later that day, Emily showed the roommate her torn jeans and told her more about what had happened the night before. Emily reported the alleged assault to the police, who then had Emily place a pretextual phone call to Eddington. Eddington was arrested and interviewed by police. During the recorded phone call and interview, Eddington maintained that all the sexual activity with Emily was consensual. He shared certain details about Emily with the police detective

regarding their sexual encounter and their conversations during the encounter. Officers obtained and executed a search warrant on Eddington's car and recovered a shotgun from the trunk. The State eventually charged Eddington with three counts of aggravated sexual assault, *see* Utah Code § 76-5-405,[2] and one count of aggravated kidnapping, *see id.* § 76-5-302.

¶7    Prior to trial, the State filed a brief motion in limine to exclude any evidence of Emily's prior sexual activity under rule 412 of the Utah Rules of Evidence.[3] *See generally* Utah R. Evid. 412 (prohibiting, in most cases, the admission of evidence offered to prove that a victim engaged in other sexual behavior and evidence offered to prove a victim's sexual predisposition). Eddington did not oppose this motion, and the trial court granted it.

¶8    At trial, however, several incidents occurred that Eddington's counsel (Counsel) argued opened the door to the admission of certain evidence regarding Emily's sexual history. First, during his opening statement, the prosecutor told the jury that Eddington "took [Emily's] virtue." After the opening statements, outside the presence of the jury, Counsel argued that because the prosecutor's remark left the jury with the impression that Eddington took Emily's virginity, which was not accurate, the State had opened the door to allow the admission of evidence regarding Emily's sexual history. The court rejected Eddington's

---

2. The alleged crimes underlying the three aggravated sexual assault charges were forcible sodomy, *see* Utah Code § 76-5-403, rape, *see id.* § 76-5-402, and object rape, *see id.* § 76-5-402.2.

3. The entirety of the State's motion read: "COMES NOW, the State of Utah, by and through its attorneys . . . , and submits the following Motion in Limine. The State objects to Defendant's use or mention of any sexual activity of the alleged victim . . . that was not with the Defendant, Neal Eddington, as these are irrelevant to the case, and prohibited by Rule 412 of the Utah Rules of Evidence."

assertion and ruled, "I think [the statement] can be interpreted in more than one way, . . . I don't think it's unduly prejudicial and I don't think it opens the door."

¶9     Later, when the prosecutor asked Emily why she did not want to watch the movie in her bedroom, she responded, "Because it was a first date and I barely knew him. . . . And I'm not the kind of girl that invite[s] guys into my bedroom." A few minutes later, in response to a question from the prosecutor about what she was saying during the attack, Emily stated, "[I told Eddington] I didn't want to and that that wasn't the person I was. I asked him to stop." Emily also testified, "I kept asking him to stop because I didn't want that, that's not who I am," when explaining why she told Eddington to stop kissing her breasts, back, and buttocks. Counsel again argued that these statements were "commenting on [Emily's] prior sexual behavior and opening the door and creating a false impression in the mind of the jury about what she does or doesn't do." To remedy this asserted misimpression, Counsel wanted to ask Emily two follow-up questions: (1) "Isn't it true that you have invited guys into your bedroom and had sexual activity on prior occasions?" and (2) "Isn't it true that you have had sexual activity on prior occasions?" However, the court did not permit Counsel to ask these questions, determining that Emily's statements during her testimony did not open the door to the admission of any evidence of her sexual past.

¶10    As part of its case, the State submitted to the jury the recordings and transcripts of Eddington's phone call with Emily and his interview with police. The police interview was redacted to comply with the court's pre-trial rule 412 ruling to exclude "portions that made reference to prior sexual activity." Specifically, the version given to and heard by the jury omitted statements Eddington made to the detective that, during the evening in question, he and Emily had talked about their past dating experiences and that Emily had told Eddington that she had prior sexual experience, including experience performing oral sex.

¶11    In the unredacted portion of the interview, Eddington described for the police some of the activities that occurred between him and Emily, which included Emily instructing him on how to rub his penis between her breasts and ejaculate, telling him she was climaxing while he was touching her, and consoling him when he expressed religious guilt about their sexual activity by telling him that what they were doing was "not a big deal." The jury listened to the redacted version of the recordings of both the phone call and the interview and had the written transcripts as exhibits, and Counsel highlighted Eddington's expression of religious guilt while cross-examining the detective who conducted the interview. But when questioning Emily and the detective, neither Counsel nor the State asked questions about Emily's statements made to Eddington during the night of the incident or the behavior disclosed by Eddington during his interview. In particular, Counsel did not ask Emily to confirm that she had made the statements and taken the actions that Eddington indicated she had made or taken.

¶12    Throughout his interview with police, Eddington maintained that all the activity between him and Emily was consensual. He did admit to the detective, however, that he "was a little aggressive," that he ripped Emily's pants and bra, that he threw Emily on the bed when they went to the bedroom, and that though Emily said "no" several times and he pulled back, he thought "she was just kind of being like oh, no, like, like you should do it . . . like kind of like teasing [him], like egging [him] on." Eddington's defense to the charges was that Emily, after the fact, regretted the consensual sexual activity the two had engaged in and was worried about the judgment of her roommates. Counsel argued in closing,

> [Emily's] living with these roommates, the female roommates, all the roommates were there, all the roommates were aware that [Eddington] spent the night. . . . [I]t was unusual for anyone to have a sleep over, that's not something that was usually done, that wasn't something that was basically acceptable

behavior in this house. Her roommates and—and certainly, we do know that there was a lot, by—by both people's account, . . . there was a lot of sexual conduct that occurred that night. Her roommates, in this case, are not going to judge her, at least as soon as she says I'm a victim, I'm a victim in this case, . . . I did not agree to what happened, he spent the night against my will, all the sexual behavior that happened was against my will and by saying that I'm a victim, then she doesn't have to deal with the idea that she crossed any of her own boundaries, the boundaries of her roommates.

¶13　At the close of the State's case, Eddington moved for a directed verdict on all the aggravated charges, arguing that the State had failed to prove the aggravation elements relating to threats of serious bodily injury or harm with a weapon: "No overt or verbal threat was actually made in this case. . . . [J]ust the fact that there was a weapon that was mentioned by [Eddington] that was out in the car, not accessible and never referenced as a threat is simply not enough to sustain aggravated charges, either with respect to the sexual assaults or the kidnapping." The trial court denied the motion.

¶14　The parties submitted their requested jury instructions prior to trial. Eddington requested that the jury be instructed on the lesser included offense of sexual battery on each of the three counts of aggravated sexual assault, and the State requested that the jury be instructed on the lesser included offenses of forcible sodomy on Count 1, rape on Count 2, and object rape on Count 3. The court instructed the jury on each of these offenses. Eddington did not object to the State's request for instructions on the lesser included offenses and did not ask the court to direct a verdict with respect to any of the lesser included offenses. Ultimately, the jury acquitted Eddington of the aggravated sexual assault and aggravated kidnapping charges, as well as most of the lesser included offense charges. However, it found him guilty of two of

the lesser included offense charges: one count of sexual battery (with respect to Count 2, alleging sexual intercourse) and one count of object rape (with respect to Count 3, alleging digital penetration). Eddington did not raise any post-trial motions challenging the jury's verdict.

¶15   Eddington appealed his convictions and requested that this court remand the matter pursuant to rule 23B of the Utah Rules of Appellate Procedure to develop the record with respect to ineffective assistance of counsel. Eddington alleged that Counsel performed deficiently by failing to seek the admission of and confront Emily with certain evidence relating to her prior sexual activity and certain details of the sexual encounter between the two. Eddington asserted that this evidence (1) was not barred by rule 412 and (2) was relevant to the element of Eddington's mens rea as to consent. We granted the rule 23B motion.

¶16   Following remand and an evidentiary hearing, the district court determined that Counsel was aware of certain evidence in advance of trial. Specifically, the court found that Counsel knew that Emily told Eddington she had previously invited men into her bedroom; had previously engaged in sexual activity, including intercourse and oral sex; and was protected from pregnancy through her use of birth control. The district court also found that from Eddington's police interview, Counsel knew that during the alleged attack, according to Eddington, Emily had asked him to perform oral sex on her, coached him on a sexual position, consoled him when he expressed religious guilt about what they had done, told him she had been told she was good at performing oral sex, and told him she had climaxed during their encounter.[4] Emily confirmed most of this information at the

---

4. The evidence of Emily's statements regarding her use of birth control does not appear in Eddington's police interview transcript, nor is Emily's alleged request for oral sex clearly articulated. The statements also do not appear in the exhibit of redacted portions provided to the rule 23B court, although there

(continued…)

remand hearing, although she testified that she did not remember whether she told Eddington about her prior experiences performing oral sex.[5] However, she explained that the reason she asked for oral sex, coached Eddington about the sexual position, consoled him regarding his religious guilt, and told him she had climaxed was to redirect him to less painful activities and "to please him" because she was "scared." She also testified that had she been asked about her statements at trial that she was not "that kind of girl," she would have clarified that she was not the sort of person who takes someone to her room or engages in sexual activity on a first date.

¶17 Counsel testified at the rule 23B hearing, and the district court recited some of her testimony in its findings. Counsel expressed regret about not seeking the admission of or using the evidence listed above to cross-examine Emily because she "felt like . . . it would have been a different outcome" if she could have questioned Emily about the details of the encounter. She explained that although she "focused on" only the "two pieces of evidence" to which she believed Emily's testimony opened the door—that she had previously invited men to her room and that she had previously engaged in sexual activity—"'looking back now' . . . 'in hindsight,' she should have and would have proffered the additional items of . . . evidence that she had at trial." However, Counsel admitted that she had been focused on other things happening at trial and was not "thinking of all of the evidence that [she] had available." Although she acknowledged

---

are additional redacted portions that were not included in the rule 23B transcript exhibit. Thus, it is unclear whether Counsel became aware of this evidence from the unredacted transcript or learned about it from Eddington.

5. Counsel testified at the remand hearing that she knew from Eddington's police interview that Emily had "described to him that she gave very good blow jobs and that she took pride in that." But this statement had been redacted from the transcript that was given to the jury.

that some of the information was presented to the jury through Eddington's police interview, Counsel opined that "it would have been dramatically different had it come in through [Emily]." (Quotation simplified.)

ISSUES AND STANDARDS OF REVIEW

¶18 Eddington now appeals and presents three issues for our consideration. First, he asserts that the evidence admitted at trial was insufficient to support the jury's verdict convicting him of the lesser included offenses of sexual battery and object rape in light of the fact that the jury acquitted him of the aggravated charges and the other lesser included charges. We will uphold a jury verdict as long as "some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Maestas*, 2012 UT 46, ¶ 177, 299 P.3d 892 (quotation simplified). However, "a defendant must raise the sufficiency of the evidence by proper motion or objection to preserve the issue for appeal." *State v. Prater*, 2017 UT 13, ¶ 27, 392 P.3d 398 (quotation simplified). And "[w]hen a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443.

¶19 Eddington next claims that the trial court erred in limiting Counsel's cross-examination of Emily by ruling that Emily's testimony had not opened the door to the admission of certain evidence regarding Emily's sexual history. "When reviewing a trial court's decision to limit cross-examination, we review the legal rule applied for correctness and the application of the rule to the facts of the case for an abuse of discretion." *State v. Vigil*, 2013 UT App 167, ¶ 8, 306 P.3d 845 (quotation simplified). "If that review convinces us that an error has occurred, we must then determine whether, assuming that the damaging potential of the cross-examination had been fully realized, we are convinced that the error was harmless beyond a reasonable doubt." *State v.*

*Marks*, 2011 UT App 262, ¶ 11, 262 P.3d 13 (quotation simplified), *superseded on other grounds by statute as stated in State v. Steffen*, 2020 UT App 95, 468 P.3d 568.

¶20    Eddington lastly asserts that he received constitutionally ineffective assistance of counsel because, though much of the evidence elicited at the rule 23B hearing was known to Counsel prior to the trial and some of that evidence was introduced to the jury through Eddington's redacted police interview, Counsel did not seek to use any of that evidence to impeach Emily during cross-examination or to support Eddington's motion that Emily's testimony opened the door to allow Counsel to impeach her with evidence of her sexual past. "In ruling on an ineffective assistance claim following a rule 23B hearing, we defer to the trial court's findings of fact . . . ." *State v. Arriaga*, 2012 UT App 295, ¶ 11, 288 P.3d 588 (quotation simplified). But we "must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).


ANALYSIS

I. Sufficiency of the Evidence

¶21    Eddington argues that there was insufficient evidence for the jury to find him guilty of the lesser included offenses of object rape and sexual battery "in light of" the fact that it acquitted him of the aggravated sexual assault crimes and the other lesser included offenses. But Eddington did not properly preserve this issue for appellate review.

¶22    Eddington maintains that because the jury acquitted him of aggravated sexual assault, forcible sodomy, rape, and aggravated kidnapping, the State's non-consent evidence must have been insufficient to support his convictions on sexual battery

and object rape.[6] Eddington acknowledges that he did not preserve a sufficiency challenge before the trial court regarding the lesser included offenses—he moved for a directed verdict only on the aggravation elements relating to the threats of serious injury or harm with a weapon. Nevertheless, he asks us to excuse his failure to preserve the issue under the exceptional circumstances doctrine, which allows an appellate court to review an unpreserved issue when "a rare procedural anomaly has either prevented an appellant from preserving an issue or excuses a failure to do so." *State v. Johnson*, 2017 UT 76, ¶ 29, 416 P.3d 443 (quotation simplified).

¶23    Eddington argues that "a rare procedural anomaly exists" because "[t]here seems to be no logical procedural means to properly 'preserve' a sufficiency of the evidence argument to a verdict of guilt upon lesser-included offenses, until after the verdict." However, Eddington's argument presupposes that whether sufficient evidence supports conviction of a lesser included offense must be analyzed in conjunction with the jury's acquittal on the greater offense. But this is not the case. To accept Eddington's exceptional-circumstances argument here—that he

---

6. Eddington alternates in his brief between referring to this argument as a sufficiency-of-the-evidence challenge and referring to it as an inconsistent-verdict challenge, perhaps because the standard for assessing an inconsistent-verdict challenge rests, to a large degree, on an assessment of whether the evidence adduced at trial supports a rational determination of guilt on the charges upon which the defendant was convicted. *See State v. LoPrinzi*, 2014 UT App 256, ¶ 30, 338 P.3d 253 (explaining that "so long as sufficient evidence supports each of the guilty verdicts, state courts generally have upheld . . . convictions" in the face of an inconsistent verdict challenge (quotation simplified)). Although his briefing is not entirely clear on this point, we interpret him as making an insufficiency-of-the-evidence claim in which he asserts that the evidence supporting the guilty verdicts must be insufficient given the jury's arguably inconsistent acquittals on some of the other charges.

was not able to challenge the sufficiency of the evidence on the lesser included offenses prior to the verdict because he did not know until after the verdict was returned that the jury did not believe Emily's claims of non-consent—we would have to agree that Eddington had no opportunity to raise a sufficiency challenge to the elements of the lesser included offenses. But we do not agree with that premise. Instead, we view Eddington's challenge to the State's evidence of non-consent as a traditional sufficiency-of-the-evidence challenge that must be raised in the trial court and preserved for appeal. *See State v. Darnstaedt*, 2021 UT App 19, ¶ 21, 483 P.3d 71 ("To preserve an issue for appeal, a defendant must lodge a timely and specific objection in the district court." (quotation simplified)), *cert. denied*, 496 P.3d 716 (Utah 2021).

¶24　Here, the evidence required to prove lack of consent with respect to the lesser included offenses was the same or less[7] than that needed to prove consent as to the greater offenses. Yet Eddington did not raise a directed-verdict motion with respect to consent on any of the charges—his motion was directed only to the aggravating factors that were an element of the aggravated charges. Indeed, a directed-verdict motion with respect to consent would have been futile, on this record, because the State introduced evidence that Emily did not consent to the sexual intercourse or digital penetration: Emily's testimony at trial that she told Eddington "no" at least twenty times during the encounter is clearly sufficient evidence "from which a reasonable jury" could find lack of consent "beyond a reasonable doubt." *See State v. Gonzalez*, 2015 UT 10, ¶ 27, 345 P.3d 1168 (quotation simplified); *see also State v. Hamilton*, 2003 UT 22, ¶ 41, 70 P.3d 111

---

7. With respect to the three aggravated charges and the lesser included offenses of forcible sodomy, rape, and object rape, the jury was instructed that Eddington had to have "acted with intent, knowledge or recklessness that [Emily] did not consent." With respect to the lesser included offense of sexual battery, the jury was instructed that the elements required proof that Eddington "knew or should have known [his actions] would likely cause affront or alarm to" Emily.

(explaining that the inquiry is whether "the evidence and all inferences that can be reasonably drawn from it" is capable of supporting a finding of guilt beyond a reasonable doubt); *State v. Escobar-Florez*, 2019 UT App 135, ¶ 60, 450 P.3d 98 ("Evidence is sufficient when, viewed in the light most favorable to the State, there exists some evidence from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." (quotation simplified)), *cert. denied*, 458 P.3d 98 (Utah 2020).

¶25　The fact that there is no procedural means to challenge the sufficiency of the evidence after the verdict is not problematic because a verdict does not change the posture of a sufficiency of the evidence claim—whether evidence is "capable of supporting a finding of guilt beyond a reasonable doubt," *Hamilton*, 2003 UT 22, ¶ 41 (quotation simplified), is not an inquiry that changes "in light of" a jury's verdict. Moreover, that Counsel chose to pursue a defense strategy that included requesting that the jury be instructed on the lesser included offense of sexual battery does not appear to present a rare procedural anomaly that warrants an exception to the preservation requirement.[8] Indeed, this strategy appears to be a reasonable one. *See generally State v. Hull*, 2017 UT

---

8. In addition to asserting that Eddington failed to preserve his insufficiency claim, the State also argues that—at least with respect to the sexual battery conviction—Eddington invited any error by asking the trial court to give a jury instruction regarding sexual battery. We acknowledge the strength of the State's argument in this regard. *See State v. Reece*, 2015 UT 45, ¶ 22, 349 P.3d 712 (stating that "a defendant's right to a lesser included offense instruction is limited by the evidence and only justified where there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense" (quotation simplified)). But we need not reach the merits of this argument in light of the fact that Eddington failed to preserve any challenge to the sufficiency of the evidence on the lesser included offenses and in light of our conclusion that none of the exceptions to our preservation doctrine apply here.

App 233, ¶¶ 16–17, 414 P.3d 526 ("[R]equesting a lesser-included-offense instruction is within counsel's strategic discretion . . . ."). Thus, Eddington cannot establish that exceptional circumstances precluded him from preserving an argument that the evidence of consent on the lesser included offenses was insufficient, and we therefore do not consider the merits of his unpreserved challenge on appeal. *See Johnson*, 2017 UT 76, ¶ 15.

## II. Cross-Examination and Opening the Door

¶26 Eddington next claims that the trial court exceeded its discretion in limiting his cross-examination of Emily, arguing that Emily and the prosecutor opened the door to the introduction of certain evidence—that would otherwise be inadmissible under rule 412 of the Utah Rules of Evidence—about Emily's previous sexual activity. We agree with Eddington.

¶27 We see no problem—and the parties have not argued otherwise—with the trial court properly entering a pretrial order consistent with Utah's rape shield rule. *See* Utah R. Evid. 412. But the court exceeded its discretion in using this pretrial ruling to act not as a shield—as the rule intends—but as a sword and an excuse to allow the prosecution and its witness to state or infer facts the court had already ruled could not come before the jury. The protections of rule 412 are to be realized only when the prosecution and its witnesses also continue to abide by the same restrictions they have asked the trial court to impose on the defendant. This court anticipated and warned of a situation like this in *State v. Marks*, 2011 UT App 262, 262 P.3d 13: "Because Utah's rape shield law excludes otherwise relevant and admissible evidence, the prosecutor must be careful not to abuse the protection afforded by the [rule] by implying that the victim is more sexually pure than the facts suggest. A false innuendo raised by the prosecution may constitute a waiver of the rape shield." *Id.* ¶ 73 (quoting with approval R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 233 (2009–2010 ed.)),

*superseded on other grounds by statute as stated in State v. Steffen*, 2020 UT App 95, 468 P.3d 568.[9]

¶28    We find the reasoning of other jurisdictions persuasive on this point. In *State v. Williams*, 487 N.E.2d 560 (Ohio 1986) (per curiam), the alleged victim "testified on direct examination . . . she did not have sex with men because she was 'gay.'" *Id.* at 560–61.[10] In response, the defendant proffered testimony that "directly refute[d] this contention." *Id.* at 563. The Ohio Supreme Court determined the proffered testimony advanced by the defendant was admissible—even within the context of the state's rape shield law—because it served the "important purpose" of "negat[ing] the implied establishment of [the consent] element of the crime

---

9. Courts often note that rape shield laws should act only as a shield and not as a sword. *See People v. Watkins*, No. 180973, 1997 WL 33354322, at *2 n.2 (Mich. Ct. App. Jan. 28, 1997) (per curiam) ("The prosecutor cannot use the rape shield law both as a shield and a sword."); *Commonwealth v. Spiewak*, 617 A.2d 696, 702 (Pa. 1992) (stating that the rape shield law "cannot be both shield and sword"); *McCullum v. Commonwealth*, No. 2003-SC-001009-MR, 2006 WL 436107, at *13 (Ky. Feb. 23, 2006) ("The line of demarcation between the right to confrontation and the rape shield rule is crossed when the shield becomes a sword." (quotation simplified)); *Commonwealth v. Reed*, 644 A.2d 1223, 1231 (Pa. Super. Ct. 1994) ("The rape shield law was intended to be a shield not a sword." (quotation simplified)); *Mitchell v. Class*, 524 N.W.2d 860, 864 (S.D. 1994) (warning that where a rape shield ruling is used as a sword, "it may become a two-edged sword requiring a new trial").

10. We recognize that there was some dispute in *Williams* about whether the record supported the finding that the victim actually testified that the reason she did not consent to sexual intercourse with the defendant was that she had a preference for women. *See* 487 N.E.2d 560, 565 n.3 (Ohio 1986) (per curiam). But we find this case persuasive for its reasoning, not for the accuracy of its specific facts.

charged." *Id.* "For this reason," the court concluded, "the probative value of the testimony outweigh[ed] any interest the state has in exclusion." *Id.* Of note for our purposes, the court found, "It is significant that the *state* first elicited the testimony which inferred lack of consent. Had [the defendant] initiated this inquiry, he would be bound by the victim's answer." *Id.* Because the "exclusion of testimony to refute [the victim's] assertion regarding her sexual preference [did] not relate to the statutory goal of insulating a rape victim from an invasion of her sexual privacy when the victim herself raise[d] the issue," the victim "waived the protection of the rape shield law." *Id.* at 564 (Wright, J., concurring).

¶29 In *Commonwealth v. Spiewak*, 617 A.2d 696 (Pa. 1992), a defendant was charged with "involuntary deviate sexual intercourse"[11] committed against his fifteen-year-old stepdaughter. *Id.* at 697. The prosecution had introduced evidence that the complainant had told her boyfriend that she had experienced oral sex with *an* older man when she was under the age of sixteen, inferring that the experience was with only *one* man and that man was her stepfather. *Id.* at 698–99. But the complainant had also given prior sworn testimony in a separate proceeding that an older man—who was a friend of her stepfather—had induced her to have oral sex by offering her cocaine when she was under sixteen. *Id.* The defendant—who admitted to having engaged in sexual activity with the complainant but insisted that it occurred after she had turned sixteen—argued that the complainant's "prior sworn testimony concerning similar conduct," *id.* at 697, was not barred by the rape

---

11. At the time, Pennsylvania defined deviate sexual intercourse as oral or anal sexual intercourse between unmarried persons. *See* 18 Pa. Const. Stat. § 3101 (1988). The relevant Pennsylvania statute established that "[a] person commits a felony of the first degree when he engages in deviate sexual intercourse with another person . . . who is less than 16 years of age." *Commonwealth v. Spiewak*, 617 A.2d 696, 697 n.1 (Pa. 1992); *see also* 18 Pa. Const. Stat. § 3123 (1988) (defining involuntary deviate sexual intercourse).

shield law, because it was offered not "to show any general moral turpitude or defect of the complainant, but because it raised doubts about the truthfulness, the accuracy, and the weight to be afforded her testimony on the present charge[]," *id.* at 699. The trial court did not allow the prior sworn testimony to be broached on cross-examination, saying that doing so was "absolutely precluded" by the rape shield law. *Id.* at 698.

¶30 The Pennsylvania Supreme Court agreed with the defendant on appeal, noting that the rape shield law "does not act to prohibit relevant evidence which may exculpate a defendant of the crime with which he is charged." *Id.* at 699. Significantly, the court observed that the prosecution "exploited" and "took unfair advantage of the exclusion of the prior sworn testimony" to "promot[e] the inference that there was only *one* older man"—the stepfather. *Id.* at 701. The court observed,

> The combined effect of this conduct by the Commonwealth was to raise the issue of the [complainant's] social and sexual relationships and use it to advance an inference that the [complainant] confided to [her boyfriend] that she had experienced oral intercourse with the [defendant] prior to her sixteenth birthday. Once the Commonwealth anchored *an* incident of oral intercourse with *an* older man prior to [the complainant's sixteenth birthday], it then became even more critical to permit [the defendant] to argue a contrary inference relating to that relationship.

> The [rape shield] statute cannot be both shield and sword. Here a statute is so designed to protect the witness's interest in preventing prejudicial disclosure of the witness's past behavior. It cannot at the same time preclude a defendant from offering evidence which is so highly probative of the witness's credibility that such evidence is necessary

> to allow/permit a jury to make a fair determination
> of the defendant's guilt or innocence. The statute
> must yield to a defendant's basic constitutional
> right.

*Id.* at 701–02.

¶31    And in *State v. Cannon*, 776 A.2d 736 (N.H. 2001), the defendant argued that the trial court erred in excluding testimony regarding a complainant's prior consensual sexual activity. *Id.* at 737. While the defendant acknowledged that such testimony was generally "inadmissible under the rape shield doctrine," he argued that the complainant "opened the door to the admission of [the] testimony when she testified that the reason she did not want to have sex with the defendant was because she had a boyfriend." *Id.* The defendant sought to call a witness who would testify that the complainant had consensual sex with another man, who was not her boyfriend, just a few weeks before and in circumstances very similar to the charged incident of sexual assault. *Id.* at 738.

¶32    The New Hampshire Supreme Court agreed with the defendant, *id*. at 737, noting that "[w]hile normally evidence of the complainant's sexual history would be excluded pursuant to the rape shield doctrine, the prosecution opened the door to the admissibility of [the] testimony when it asked the complainant why she pushed the defendant's hands away and told him 'No.'" *Id*. at 738. It further explained,

> She had no obligation to explain her reasoning for
> not consenting; however, once she did so at the
> request of the State, the defendant was entitled to
> present evidence to refute her assertion. The central
> issue in this case was whether the complainant
> consented to having sexual intercourse with the
> defendant. The complainant's testimony [that she
> did not consent because she had a boyfriend] served
> only to bolster her credibility regarding the issue of

consent. In such a circumstance, the defendant is entitled to rebut this assertion because the probative value of the proffered evidence would outweigh its prejudicial effect on the victim.

*Id.* at 739 (quotation simplified). In other words, the complainant's prior sexual activity was not relevant to whether she consented to later sexual activity until the prosecution made it relevant by asking her why she refused the defendant's sexual advances. Thus, it was not the prior sexual activity, standing alone, that was relevant. Rather, it was when the prosecution used that prior sexual activity to provide a basis for asserting a lack of consent on a later occasion that it became relevant. Once the prosecution opened that door, the defendant had the right to rebut the assertion with testimony to the contrary.

¶33    Here, during his opening statement, the prosecutor stated that Eddington "held [Emily] prisoner and then he took whatever he wanted: he took her body, he took her virtue, he took her will." Then, during her direct testimony, in response to the State's question about why she wanted to watch the movie in the living room, Emily testified that she was "not the kind of girl that invites guys into [her] bedroom." A few minutes later, in response to a question about what she said during the attack, Emily responded that she told Eddington that she did not want him to fondle and kiss her breasts because "that wasn't the person [she] was" and that she asked Eddington to stop kissing her lower back and buttocks because she "didn't want that, that's not who [she is]."

¶34    Prior to cross-examining Emily—and to correct what Counsel alleged was a false impression about Emily's chastity and to impeach Emily's claim of non-consent—Counsel argued that Emily's statements about the kind of person she was opened the door to admission of evidence of specific instances of her prior sexual behavior. Specifically, Counsel requested that she be allowed to ask Emily whether she had invited men to her

bedroom on previous occasions and whether she had previously engaged in sexual intercourse. Counsel explained that Emily had told Eddington "about two long-term boyfriends [with whom] she had engaged in both oral sex and intercourse." The trial court refused to allow Counsel to ask Emily questions about inviting men to her bedroom or having sexual relations on other occasions because that information in the context of rule 412 was "insufficiently probative to outweigh the highly prejudicial effect of its introduction at trial."

¶35 On appeal, Eddington argues that the trial court's application of rule 412 to prohibit him from questioning Emily about inviting men to her bedroom on prior occasions and about her sexual past violated his constitutional rights. The United States Constitution guarantees a criminal defendant "a meaningful opportunity to present a complete defense" to criminal charges. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quotation simplified). This right emanates from the right of confrontation, the right to compulsory process, and the right to due process. *See State v. Thornton*, 2017 UT 9, ¶ 74, 391 P.3d 1016; *see also Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The rights to confront and cross-examine witnesses . . . have long been recognized as essential to due process."). Nevertheless, a defendant's constitutional right to present a complete defense is not absolute and "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process" and thus allow a trial judge to limit cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Michigan v. Lucas*, 500 U.S. 145, 149 (1991) (quotation simplified); *see also Thornton*, 2017 UT 9, ¶ 76 ("[T]he Sixth Amendment right to present a defense is far from absolute."). Thus, both the United States Supreme Court and the Utah Supreme Court have recognized that a defendant's right to present evidence is subject to reasonable restrictions that limit the presentation of otherwise admissible evidence. *See United States v. Scheffer*, 523 U.S. 303, 308 (1998).

¶36 Rule 412 is an example of Utah's recognition that the defendant's right to present evidence may be limited to accommodate the interests of an alleged victim of sexual assault. The rule generally prohibits the introduction, in certain criminal cases, of any evidence of a victim's past sexual behavior or sexual predisposition. *See* Utah R. Evid. 412(a)(1)–(2).[12]

¶37 But the rule itself recognizes exceptions, and evidence of a victim's prior sexual history is admissible under the rule if its "exclusion would violate the defendant's constitutional rights" to a fair trial. Utah R. Evid. 412(b)(3). Such violation occurs "only when the exclusion is arbitrary or disproportionate to the purposes that rule 412 was designed to serve" because "the application of rule 412 significantly undermine[s] fundamental elements of a defendant's defense." *State v. Steffen*, 2020 UT App

12. Rule 412 states that evidence offered to prove that "a victim engaged in other sexual behavior" or has a certain "sexual predisposition" "is not admissible in criminal . . . proceedings involving alleged sexual misconduct." Utah R. Evid. 412(a)(1)–(2). Rape shield rules like Utah's were adopted in response to anachronistic and sexist views that a woman who had consented to sexual activity in the past was more likely to have consented to sexual relations with an alleged rapist. *See State v. Marks*, 2011 UT App 262, ¶ 15, 262 P.3d 13 (recognizing "that in most instances, an alleged victim's prior sexual conduct is simply not relevant to the issue of whether a rape or sexual assault has occurred"), *superseded on other grounds by statute as stated in State v. Steffen*, 2020 UT App 95, 468 P.3d 568. The protections in the rape shield laws acknowledge that inquiries into the irrelevant sexual history of a victim are not only prejudicial and embarrassing but also a practical barrier to many victims reporting sexual crimes. *See* Utah R. Evid. 412, advisory committee note (1994); *see also State v. Tarrats*, 2005 UT 50, ¶ 20, 122 P.3d 581 (noting that the rape shield laws were adopted "to ensure that sexual assault victims are not deterred from participating in prosecutions because of the fear of unwarranted inquiries into [their] sexual behavior" (quotation simplified)).

95, ¶ 17, 468 P.3d 568 (quotation simplified). "It is not enough to show that [rule 412] excludes favorable evidence." *Thornton*, 2017 UT 9, ¶ 77 (quotation simplified). Rather, the defendant must prove "that the evidence in question is essential to the presentation of a defense" and that "the state's interest in enforcing its rules of evidence is disproportionate to the weighty interest of the accused." *Id*. ¶ 78 (quotation simplified). In other words, rule 412 cannot be applied mechanistically to prevent the defendant from effectively challenging the truthfulness of the alleged victim when both she and the prosecution have made her sexual past relevant. A defendant's confrontation right is violated if a court prohibits a defendant "from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (quotation simplified); *see also State v. Clark*, 2009 UT App 252, ¶ 16, 219 P.3d 631.

¶38    Here, the trial court excluded the evidence of Emily's sexual history because it determined that the probative value of that evidence did not outweigh the possible harm to Emily or the fact-finding process. Specifically, the court found that such evidence was "ordinarily insufficiently probative to outweigh the highly prejudicial effect of its introduction at trial." But after the prosecutor's statement regarding virtue and Emily's multiple statements concerning "who" she is in a sexual context, the situation at trial was no longer ordinary. The proverbial door had been opened. We are especially troubled by the State's representation in its opening statement that Eddington "took [Emily's] virtue."[13] We determine that, in this circumstance, the

_____

13. The prosecutor claimed that his reference to Eddington taking Emily's virtue did not mean taking her virginity, explaining, "[I used] it in a broader sense of when you sexually assault a woman, you're taking her virtue. It's a—it's a common religious term and it is a—a common religious usage of the term." But the inference

(continued…)

trial court exceeded its discretion in categorically disallowing Counsel from asking Emily further questions about her sexual past when Emily made statements that implicated her veracity as to her sexual disposition as colored by the State's reference to Emily's virtue being taken. Accordingly, we conclude that the trial court's ruling was outside the bounds of reasonableness. The prosecutor's reference to Emily's virtue being taken and Emily's direct reference to her sexual disposition together made Eddington's proffered evidence especially probative. In contrast, we discern no significant prejudice where the need to rebut the statement or inference was generated by the prosecutor and the witness themselves.[14]

¶39   As in many sexual assault cases, there were only two witnesses to the events that evening. Given that Emily was the main witness at trial and the disputed issue was consent, her credibility was critical to the State's case. Eddington argues that Emily's testimony that she was not the type of person who invited men into her bedroom or let men fondle her breasts or kiss her lower back and buttocks left the jury with a false impression. We agree. Counsel's proffered questions were not aimed at attacking Emily's morality or offered to imply that a sexual assault victim

---

suggested by the use of the word "virtue" is certainly that Emily had no prior sexual experience, and we find it hard to imagine that the jury interpreted the prosecutor's statement in any other way.

14. This circumstance of "opening the door" is a corollary to the "principle of curative admissibility," which "provides that a party who interjects into a case inadmissible evidence cannot complain on appeal that [their] adversary subsequently offered and was permitted to introduce the same kind of evidence." *See State v. Guerro*, 2021 UT App 136, ¶ 29, 502 P.3d 338 (quotation simplified); *see also State v. Mahi*, 2005 UT App 494, ¶ 17, 125 P.3d 103 ("A party cannot introduce potentially inflammatory evidence and then later complain when the opposing party attempts to rebut it.").

who has a sexual past should be viewed as less credible than a victim who has no prior sexual history. Rather, Counsel requested that she be allowed to ask Emily about having men in her room and whether she had engaged in sexual intercourse in the past to rebut the misimpression created by the prosecution that Emily had no sexual past—an inference that was not factually correct.[15] *See generally State v. Martin*, 2002 UT 34, ¶ 33, 44 P.3d 805 (stating that where the central issue at trial was whom to believe about the circumstances of the sexual contact, evidence relevant to challenge credibility should be admitted). Under these circumstances, the trial court's limitation on Eddington's constitutional right to cross-examine Emily exceeded its discretion.

¶40    Though we determine the trial court erred in limiting cross-examination, this does not end our inquiry, as certain constitutional errors can be "harmless" in terms of their effect on the fact-finding process at trial. *See Chapman v. California*, 386 U.S.

---

15. We acknowledge our supreme court's statement in *State v. Boyd*, 2001 UT 30, 25 P.3d 985, that "[t]here is no exception in rule 412 that allows for the admission of past sexual conduct to impeach witnesses," *id.* ¶ 38 n.4, but we agree with this court's previous understanding of that pronouncement:

> [T]he footnote merely reflects the supreme court's agreement with the advisory committee notes that rule 412 presumptively excludes evidence of the complainant's prior sexual activity, even if such evidence is offered for impeachment purposes. . . . There is nothing in the supreme court's decision in *Boyd*, however, that suggests evidence offered for impeachment purposes must be categorically excluded if to do so would violate the defendant's constitutional rights.

*State v. Marks*, 2011 UT App 262, ¶ 45, 262 P.3d 13, *superseded on other grounds by statute as stated in State v. Steffen*, 2020 UT App 95, 468 P.3d 568.

18, 24 (1967) (holding that a constitutional error may be held harmless if the error "was harmless beyond a reasonable doubt"); *see also Van Arsdall*, 475 U.S. at 681 ("The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." (citation omitted)); *see also State v. Vigil*, 2013 UT App 167, ¶ 11, 306 P.3d 845. In other words, violations of the right of cross-examination do not require reversal if the State can show beyond a reasonable doubt that the error did not contribute to the verdict. *See State v. Farnworth*, 2018 UT App 23, ¶ 24, 414 P.3d 1053 ("Where the error in question amounts to a violation of a defendant's right of confrontation guaranteed by the Sixth Amendment to the United States Constitution, its harmfulness is to be judged by a higher standard, i.e., reversal is required unless the error is harmless beyond a reasonable doubt. Under this standard, the burden shifts to the State to demonstrate that the error was harmless beyond a reasonable doubt." (quotation simplified)). Whether an error is harmless beyond a reasonable doubt depends on a host of factors, including "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684; *see also State v. Drommond*, 2020 UT 50, ¶ 105, 469 P.3d 1056.

¶41 Here, Emily was, of course, the key prosecution witness to the facts supporting the charged crimes. "In this sense, her testimony was of ultimate importance." *See Vigil*, 2013 UT App 167, ¶ 14. The State argues that any error in precluding cross-examination on Emily's sexual past was harmless because she gave reasonable explanations for those statements at the remand hearing and those explanations would have rehabilitated her testimony in the eyes of the jury. That is, as stated by the State, had she been asked at trial, Emily would have clarified that,

"[y]es, she had men in her bedroom before, and yes, she had [engaged in sexual intercourse] with some of them; but those were all steady boyfriends, which Eddington was not," and "[w]hat she meant by the 'not that kind of girl' testimony is that she wasn't the sort who brought men up to her room for sex *on a first date*." But in our view, the damaging potential of the cross-examination was that the evidence that Emily had a sexual past would have flatly contradicted the prosecutor's virtue statement made in opening. Given the importance of Emily's testimony and credibility to the strength of the State's case, Eddington should have been allowed to present this evidence to the jury so that it could fully assess Emily's credibility. *See generally State v. J.A.L.*, 2011 UT 27, ¶ 42, 262 P.3d 1 ("A rape case where the sole issue at trial is consent presents a unique circumstance not present in many other rape trials. In consent cases, physical evidence is often sparse, and few, if any witnesses are able to aid the jury in evaluating the subjective mindset of the parties to the encounter. Indeed, many of these cases hinge on a he-said-she-said credibility contest between the alleged perpetrator and the victim."). Accordingly, Emily's explanations about her statements do not render the error harmless beyond a reasonable doubt.[16]

¶42   Ultimately, there was absolutely no reason that Emily's past sexual behavior was relevant to the case until the State made it relevant. Emily was under no obligation to reveal anything about her sexual experiences with others, and both the State and Eddington were precluded by the court's pre-trial order from introducing any of that information at trial. But the prosecutor's statements and Emily's responses to questions on direct examination opened the door to Eddington having the right to rebut the inference that Emily was not the kind of a person who would engage in sexual behavior. By asserting that Eddington

---

16. Moreover, as further explained in Part III, we also determine that Counsel was ineffective for failing to seek the admission of and to question Emily about certain other evidence, which provides an independent basis for reversal.

took Emily's "virtue," the State implied that Eddington's account of events was unbelievable, especially after Emily added that she was not the type of person who invited men into her bedroom. So while Emily's sexual history should have been entirely irrelevant to this case, its use by the State prejudiced Eddington by leading the jury to believe it was relevant. *See Commonwealth v. Reed*, 644 A.2d 1223, 1231 (Pa. Super. Ct. 1994). And had Counsel been allowed to ask Emily about her sexual past, we cannot foreclose the likelihood that such information might have injected doubt into the prosecution's case. At the end of the day, if the State "wants to keep [a rape victim's] past out of the case, it must do exactly that." *See id*. That, after all, is the very purpose of the rape shield rule. It recognizes that a person's sexual history is of no relevance—except in very limited circumstances—to a later sexual assault. We encourage prosecutors to respect this boundary by avoiding the temptation to misuse a protection for rape victims as an instrument against the accused.

### III. Ineffective Assistance of Counsel

¶43 Eddington next asserts that Counsel rendered constitutionally ineffective assistance by failing to seek the admission of and to question Emily about certain evidence known to Counsel at the time of trial that was partly admitted through Eddington's redacted police interview and phone call and further adduced at the rule 23B hearing. To prevail on an ineffective assistance of counsel claim, Eddington must show both that Counsel's performance was deficient, in that it "fell below an objective standard of reasonableness," and that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. "A defendant must satisfy both parts of this test in order to successfully establish ineffective assistance." *State v. Whytock*, 2020 UT App 107, ¶ 26, 469 P.3d 1150.

¶44 Counsel's performance is deficient when it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *Scott*, 2020 UT 13, ¶ 28. Here, Eddington first argues that Counsel performed deficiently by failing to cross-examine Emily with some of the evidence that was introduced to the jury through Eddington's redacted police interview and phone call. Eddington also argues that Counsel performed deficiently by failing to argue that certain other evidence known to Counsel about Emily and the sexual encounter—evidence that was further adduced at the rule 23B hearing—was admissible because such evidence was intrinsic to the sexual encounter between Emily and Eddington and was relevant to whether Emily consented and to Eddington's knowledge of Emily's lack of consent.[17]

¶45 Eddington first argues that Counsel performed deficiently by failing to cross-examine Emily about certain claims that Eddington made during his police interview and recorded phone call: that during their encounter, Emily coached Eddington on how to rub his penis between her breasts and ejaculate; that Emily told Eddington that she was climaxing during their encounter; and that Emily consoled Eddington when he expressed religious guilt about what they had done and told him it was "not a big deal." Eddington also argues that Counsel should have sought to cross-examine Emily about other similar evidence known to Counsel at the time of trial and that was further elicited at the rule 23B hearing to impeach Emily: that during their encounter, Emily asked Eddington to perform oral sex on her, and when he did not,

17. To the extent that Eddington also asserts on appeal that Counsel performed deficiently by not arguing that the evidence that Emily told him she had previously invited men into her bedroom and that she had engaged in sexual activity with a previous boyfriend was admissible under rule 412 as intrinsic evidence offered by Eddington to prove that Emily did in fact consent, we do not need to reach this argument on its merits in light of our conclusion, in the previous section, that Emily's previous sexual experience was admissible to rebut the State's (and Emily's) misimpression that Emily had no such experience.

she asked why; that Emily told Eddington that "I've been told I give very good blow jobs"; and that Emily told Eddington that he did not need to worry about getting her pregnant because she was using birth control. Eddington argues that this evidence was admissible to impeach Emily's claim that the sexual activity was non-consensual and to show Eddington did not have knowledge of Emily's non-consent.

¶46 We agree with Eddington that Counsel performed deficiently in failing to question Emily about this evidence. Unlike direct questioning about Emily's sexual past, this evidence did not fall within the prohibitions of rule 412 because it was not evidence of "other sexual behavior" or evidence of Emily's "sexual predisposition." *See* Utah R. Evid. 412(a). To the contrary, this was information about things that happened—both statements and actions—during the specific sexual encounter between Emily and Eddington, and it therefore falls squarely within one of rule 412's exceptions. *See id.* R. 412(b)(2) (stating that a court "may admit . . . evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent"). This information arguably suggested the activity was consensual, and we conclude it was unreasonable for Counsel not to ask about this evidence, or at least attempt to do so. Specifically, evidence that Emily advised Eddington she was protected from pregnancy, coached him on how to perform a particular sex act, requested oral sex, indicated she had climaxed, and advised him that his religious-based remorse was "no big deal" may have changed the evidentiary picture on the issue of non-consent. In fact, Counsel herself expressed regret, stating that "looking back now" and "in hindsight," she should have and would have asked Emily about these statements and believed that "had the jury heard those things, it would have been a different outcome." Indeed, at the remand hearing Counsel opined that "it would have been *dramatically* different had [this evidence] come in through [Emily]." (Emphasis added.)

¶47     As to prejudice, the questioning Eddington asserts Counsel should have undertaken at trial addressed evidence that was relevant to Eddington's understanding of Emily's consent, and some of it also corroborated his version of events as recounted in his police interview. With respect to the object rape charge, the jury was required to find that Eddington "acted with intent, knowledge or recklessness that [Emily] did not consent," and with respect to the sexual battery charge, the jury was required to find that he "knew or should have known" his conduct "would likely cause affront or alarm" to Emily. Because Eddington's state of mind was an element of the crimes for which he was convicted, evidence relating to his state of mind was highly probative. Additionally, Emily's confirmation of these details of Eddington's version of events—that she was the one directing him what to do—could have strengthened his statements to the detective and led the jury to determine that he had a reasonable belief that Emily consented to the sexual activity. At the remand hearing, Emily confirmed that the statements and actions discussed above occurred. Although Emily also provided explanations for many of her actions, asserting that she did them out of fear or to redirect Eddington to less painful activities, her confirmation corroborated certain details of Eddington's version of events and provided support for his defense that the sexual activity was consensual. While that evidence certainly did not negate the contrary evidence altogether, it was the jury's prerogative to weigh all the evidence and make a determination regarding whether Eddington had the required mental state to commit the crimes in question.

¶48     Because the evidence was highly probative with respect to the issues of consent and Eddington's intent, and especially in light of the trial court's erroneous decision not to allow cross-examination about Emily's sexual history after the State opened the door, it was unreasonable for Counsel not to highlight the evidence or seek to question Emily during cross-examination to undercut her credibility. Moreover, we consider it reasonably probable that having heard Emily's corroboration of many of the details of Eddington's account, the jury would have had a

reasonable doubt regarding Eddington's intent with respect to consent.[18] Thus, we conclude that Eddington received ineffective assistance of counsel and is therefore entitled to a new trial.

CONCLUSION

¶49   We decline to review Eddington's challenge to the sufficiency of the evidence because it is unpreserved and no preservation exception applies. We further conclude that the trial court exceeded its discretion in limiting Eddington's cross-examination of the alleged victim. Additionally, Counsel rendered ineffective assistance by not seeking to cross-examine Emily about some of the details of the encounter. Accordingly, we vacate Eddington's convictions and remand for a new trial.

––––––––––

18. The State maintains that because some of the evidence in question came in through Eddington's redacted police interview, asking Emily about the evidence "would have been cumulative." But we agree with Eddington that there is a material difference between hearing the accused claim these details to be true in an interview and having them confirmed by the alleged victim. Even though Emily may have been able to explain why she requested certain things or went along with them, her confirmation that those activities occurred could have increased Eddington's credibility in the eyes of the jury, and the jury should have heard about this from Emily herself.